13-2391 SKG ⊢ 13-2309 SKG

## AFFIDAVIT IN SUPPORT OF SEARCH AND SEIZURE WARRANTS

I, MIA WINKLEY, first being duly sworn, depose, and state:

## I.   INTRODUCTION AND AGENT BACKGROUND

1.      I am a duly sworn member of the FBI and have been so employed since May 8, 1991. I am currently assigned to the Baltimore Division of the FBI in Baltimore, Maryland.

2.      I have been employed as a Special Agent with the FBI since May 1991. Since becoming an employee of the FBI, I have participated in investigations regarding the violation of civil rights by individuals acting under color of law, corruption, violent crimes, wire fraud, bank fraud and mail fraud. I have participated in the recovery of illegal items to include narcotics, records, digital devices and financial proceeds related to criminal activity. I am currently assigned to a Public Corruption and Civil Rights Squad which investigates criminal violations by public officials and individuals acting under color of law to include law enforcement officers. I was previously assigned to a Safe Streets Task Force which investigated firearms and drug trafficking organizations. I am familiar with illicit firearm and drug trafficking methods. I was assigned to the Violent Crime Major Offenders (V.C.M.O.) Squad which investigated violent criminal organizations. I have participated in numerous surveillance operations and have been the Affiant on more than seventy search warrants. I have been the affiant on two Title III affidavits and participated in Title III operations, consisting of surveillance operations, monitoring wire interceptions, reviewing wire interceptions and analyzing telephone records.

3.      Based on the facts and circumstances described in this Affidavit, I respectfully submit there is probable cause to believe that within the locations described below there are records, files, correspondence, memoranda, computers, computer disks and other electronic storage media, bank and other financial records, data, and other materials that constitute evidence

of, the fruits of, or instrumentalities of various criminal violations including, but not limited to, violations of 18 U.S.C. § 201 (bribery of public officials); § 1341 (mail fraud); § 1343 (wire fraud); 18 U.S.C. § 924(c) (possession of a firearm in furtherance of a drug trafficking crime); 21 U.S.C. § 841 (distribution of controlled substances); and § 846 (conspiracy to distribute and possess with intent to distribute controlled substance) (together, the "Subject Offenses").

4.      Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that evidence, fruits and instrumentalities of violations of the aforementioned federal statutes are located within the subject locations. The information contained in this affidavit came from my own participation in the investigation described herein, as well as from other law enforcement officers, and information gained from my personal training and experience.

## II.      LOCATIONS TO BE SEARCHED AND SEIZED

5.      This Affidavit is written in support of applications for warrants to search the following locations (collectively, the "Subject Locations"):

a.      **1227 Waterview Way, Essex, Maryland 21221 ("1227 Waterview Way")**, the residence of Richard L. WRIGHT, III ("WRIGHT") (including an unattached garage contained within the property), which is also the business location of **WRIGHT** Way Cleaning Services, owned by WRIGHT, as more fully described in Attachment A-1. A review of WRIGHT's Maryland Department of Motor Vehicle driver's license record indicates WRIGHT's address is 1227 Waterview Way, Essex, MD 21221. In addition, a review of WRIGHT's Postal Service employment records reveal his address to be 1227 Waterview Way, Essex, Maryland 21221. Probable cause specific to this location can be found at ¶¶ 27-34, 67, 76, 114,

b.      WRIGHT's office located at the Waverly Station Post Office (hereinafter, the "Waverly Post Office") located at 3000 Homewood Avenue, Baltimore, MD 21218 as more fully described in Attachment A-2. Probable cause specific to this location can be found at ¶¶ 16, 22, 23, 27-34, 61, 63, 64, 74.

d.      PARNELL's Office, 3703 Old Court Road, Pikesville, Maryland (the "Pikesville Post Office"), as more fully described in Attachment A-4. Probable cause specific to this location can be found at ¶¶ 25-26, 35-46, 61, 74, 86-91.

e.      9803 Southall Road, Randallstown, MD 21133, the residence of Ladena SKETERS-ANDERSONand the registered address of Keep U Clean Janitorial Services, LLC, as more fully described in Attachment A-5. Probable cause specific to this location can be found at ¶¶ 75-91. *

f.      Cellular telephone with call number (443) 992-2067, subscribed to and used by Richard WRIGHT at Post Office (PO) Box 16737, Essex, Maryland with service provided by Sprint. Probable cause specific to this location can be found at ¶¶ 22, 28, 29, 32, 33, 34, 43, 47, 48, 54-61, 63, 64-65, 67, 69, 71, 84, 87, 90, 93-96, 98, 100, 102, 104, 106, 108, 110, 112,

g.      Cellular telephone with call number (443) 992-0195, subscribed to by Susan Lang, 1321 Homestead Street, Baltimore, MD and used by Kimberly PARNELL. Probable cause specific to this location can be found at ¶¶ 35, 36, 39, 45, 49, 51, 54, 61, 65, 86-87.

h.      Cellular telephone with call number (443) 740-1439, subscribed to and used by Ladena SKETERS-ANDERSON, 9803 South Hall Road, Randallstown, MD. Probable cause specific to this location can be found at ¶¶ 84 and 90.

i.      Cellular telephone with call number (443) 324-5002, subscribed to and used by Shane ANDERSON at 1716 New Castle Road, Baltimore, MD. Probable cause specific to this location can be found at ¶¶ 59, 63, 64, 68, 69, and 71.

j.      A green 2004 Chevrolet truck, VIN 2GCEK13T441325238, Maryland Vehicle Administration license plate number 59R620 registered to Richard Louis WRIGHT III, 1227 Waterview Way, Essex, MD, 21221. Probable cause specific to this vehicle can be found at ¶ 31.

6.      This Affidavit is also submitted in support of applications to seize the following bank accounts, which have been used to facilitate the Subject Offenses:

*On 9/26/2013, USPS, OIG Special Agent Shay Lockitt conducted surveillance of 9803 Southall Road, Randallstown, MD, 21133 and saw a vehicle with license plate number 29478ce1 which is registered Ladena Sketers and her husband, Tyrone Robin Anderson.

a.    **Bank of America checking account no.** ▉▉▉5070, held in the name of Richard WRIGHT.  Probable cause specific to this account can be found at ¶¶ 24, 58, 67.

c.    **Susquehanna Bank checking account number** ▉▉▉7321 held in the account name of Ladena SKETERS-ANDERSON DBA Keep-U Clean Janitorial Service, P. O. Box 156 Randallstown MD 21133. Probable cause specific to this account can be found at ¶¶ 78, 83, 84, 86, 90-91.

7.    For the reasons stated herein, there is probable cause to believe that such monies are subject to seizure and forfeiture to the United States pursuant to 18 U.S.C. §§ 981 and 982, on the grounds that they constitute the proceeds of bribery, in violation of 18 U.S.C. § 201; mail fraud, in violation of 18 U.S.C. § 1341; wire fraud in violation of 18 U.S.C. § 1343; and drug trafficking, in violation of 21 U.S.C. §§ 841 and 846.  Moreover, there is probable cause to believe that the funds in the specified bank accounts are subject to criminal forfeiture pursuant to 18 U.S.C. § 982, because they have the same value as funds as the proceeds of the fraud, and thus may be seized pursuant to 21 U.S.C. § 853(f) and forfeited as substitute assets pursuant to 21 U.S.C. § 853(p).

A.    **Financial Documents**

8.    Based on my knowledge and experience, and based on discussions with experienced white-collar criminal investigators, I know that it is common for individuals who are operating a business (whether lawful businesses, wholly illicit businesses, or lawful businesses which commit unlawful activities related thereto) to maintain records related to their business such as:

- Bank and other financial records, including statements, bank receipts, deposit slips, copies of deposited items, withdrawal slips, canceled checks, bank checks, money order receipts, wire transfers, credit and debit memos, credit and debit card records, etc.;

- Financial statements, balance sheets, and other accounting records such as books, ledgers, journals, statements, receipts, and invoices;

- Records of purchase and sale of assets and investments;
- Records of services rendered, including invoices.

9.     I also know that persons engaged in financial fraud frequently retain records of their transactions within their place of business and/or other places under their control, like their homes.   These records may be in the form of written notes and correspondence, receipts, negotiated instruments, contracts, bank statements, and other records.   Persons engaged in financial crimes such as mail fraud and bribery schemes, often maintain such records for an extended period of time, particularly when they are involved in ongoing criminal conduct.

10.     There are many reasons why criminal offenders maintain evidence for long periods of time.  First, to the offender, the evidence may seem innocuous at first glance (e.g. financial, credit card, and banking documents, travel documents, receipts, client lists, documents reflecting purchases of assets, person calendars, telephone and address directories, check books, videotapes and photographs, utility records, ownership records, letters and notes, tax returns and financial records, escrow files, telephone bills, keys to safe deposit boxes, packaging materials , computer hardware and software).   To law enforcement however, such items may have significance and relevance when considered in light of other evidence.  Second, the criminal offender may no longer realize he/she still possesses the evidence or may believe law enforcement could not obtain a search warrant to seize evidence.  Third, the criminal offender may also be under the mistaken belief that he/she deleted, hid, or further destroyed computer-related evidence, which in fact, may be retrievable by a trained forensic computer expert.  In addition, I know that persons use computers to access the World Wide Web to access web based electronic mail and conduct financial transactions through banking websites.

11. Based on training and experience, I am aware that persons involved with these types of crimes (mail fraud and bribery schemes) utilize computer hardware and software in the furtherance of the scheme, most typically word processing type activity to type and store correspondence related to the matters herein and/or to send facsimiles, e-mails and other communications related to their business.

**B.  Computers and Electronically Stored Data**

12. I am aware that individuals and businesses use electronic equipment, such as computers, Personal Data Assistants (PDAs), hard disk drives, USB drives, magnetic tapes, floppy disks, CD-ROMs, DVD-ROMs, memory chips, digital cameras, scanners, and/or facsimile machines to generate (in the form of electronic data), and cellular telephones (a/k/a smartphones) to store, transfer and/or print documents containing information regarding their financial transactions. Rule 41 of the Federal Rules of Criminal Procedure permits the government to search for and seize computer hardware, software, and electronic files that are evidence of crime, contraband, instrumentalities of crime, and/or fruits of crime. In this case, I believe that any computer used by the subjects may be a container for evidence because computers often maintain data directly on their hard drives and therefore remain potentially recoverable.

13. I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted or viewed via the internet. Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. When a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until

it is overwritten by new data. Therefore, deleted files or remnants of deleted files may reside in free space or slack space - that is, in space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space - for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the internet are automatically downloaded into a temporary internet directory or "cache." The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed internet pages. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.

14. Based on my training, knowledge and participation in other fraud investigations, there is probable cause to believe that there exists in any computers, electronic equipment, electronic storage devices, etc. located in the Subject Locations, evidence of violations of the Subject Offenses. I request authority to search any computer hardware or computer-related equipment capable of creating and/or storing information in electronic or magnetic form seized during the execution of this search warrant, pursuant to the protocol listed on Attachment C.

IV. **PROBABLE CAUSE**

15. The facts set forth in this Affidavit describe a bribery and mail fraud scheme in which **WRIGHT** and **PARNELL**, through their positions as USPS Station Managers, are receiving bribe payments from landscaping and cleaning services, in exchange for authorizing fraudulent invoices for payment by the USPS to those entities for services allegedly provided to the Waverly and Pikesville Post Offices. This Affidavit will also show there is probable cause to

believe that documents, financial records, files, correspondence, memoranda, computers, electronic storage media and other evidence used to further this bribery and fraud scheme will be located in the three subject premises. In addition, this Affidavit will establish probable cause that **WRIGHT** is selling controlled substances, specifically marijuana.

16.      **Richard Lewis WRIGHT III ("WRIGHT")** is the current Station Manager of the United States Postal Service's Waverly Station at 3000 Homewood Avenue, Baltimore, MD 21218 (the "Waverly Post Office"), and has been since January 2007.

17.      **Kimberly PARNELL ("PARNELL")** is the is the current Station Manager of the United States Postal Service's Pikesville Station located at 3703 Old Court Road, Pikesville, MD (the "Pikesville Post Office"), and has been since July 3, 2010.

18.      As is more fully described below, **WRIGHT** and **PARNELL** have engaged in a scheme to commit bribery, wire fraud and mail fraud by creating false and inflated invoices for maintenance work allegedly performed at their respective Post Offices, approving those false invoices for payment to the USPS, and then splitting the proceeds with the alleged providers of the services. Both **WRIGHT** and **PARNELL** have engaged in this scheme with a confidential source (referred to herein as "CS-1"); a landscaping provider named Shane **ANDERSON**, and a cleaning services provider named Ladena **SKETERS**.

19.      **Ladena SKETERS-ANDERSON ("SKETERS")** operates Keep U Clean Janitorial Service LLC ("Keep U Clean"), a commercial cleaning service. **SKETERS** resides at **9803 Southall Road, Randallstown, MD 21133,** the registered address of Keep U Clean.[1]

---

[1]      Keep U Clean is currently recognized by the State of Maryland as being active and in good standing and operating at **9803 Southall Road, Randallstown, MD 21133**. The Articles of Organization and Certificate of Reinstatement list the business address for Keep U Clean as **9803 Southall Road, Randallstown, MD 21233**. The Articles of Organization state that Keep U Clean is a "Cleaning Business" and the resident agent is **SKETERS**, whose home address is the same as Keep U Clean's business address.

20.     Shane **ANDERSON** operates a landscaping company called Youthful Minds Lawn Care, located at 1716 New Castle Road, Baltimore, Maryland

## A.     Bribery and Fraud Scheme Between WRIGHT and Confidential Source #1

21.     Confidential Source #1 ("CS-1") operates a landscaping company, referred to herein as "CS Landscaping," which CS-1 uses to facilitate his/her bribery scheme with **WRIGHT** and to provide minimal landscaping services to **WRIGHT** and **PARNELL**. On February 20, 2013, CS-1 was interviewed by FBI and USPS OIG Agents and agreed to cooperate with the ongoing investigation. CS-1 has been cooperating in exchange for consideration with regard to his own involvement in the bribery and fraud scheme. Information provided by CS-1 has proven reliable as it was corroborated by other facts and information learned during this investigation.

22.     CS-1 advised that he/she and **WRIGHT** had engaged in a bribery and fraud scheme wherein CS-1 and **WRIGHT** worked together to submit false and inflated invoices to the USPS for landscaping and snow removal services. According to CS-1, **WRIGHT** often created the invoices for CS Landscaping services. **WRIGHT** would then submit the invoices for payment to the USPS, knowing that some (or more often, all) of the work had not been performed.[2] After **WRIGHT** submitted the false invoices for payment, **WRIGHT** monitored USPS databases to determine when a USPS check was issued to CS-1 and when the check was cashed by CS-1's bank. **WRIGHT** then routinely contacted CS-1 via text message and

---

[2]     Based on the investigation to date, I know that when **WRIGHT** and **PARNELL** submitted the false invoices, they did so electronically to the USPS commerce portal in Aurora, Colorado or mailed the false invoices via the USPS to the USPS Scanning and Imaging Center located in Janesville, Wisconsin. The invoices are then sent electronically to the USPS Accounting Services location in Eagan, Minnesota for payment processing. **WRIGHT** and **PARNELL** caused the USPS to issue checks that were mailed to CS-1 via the USPS to CS-1's Post Office box.

telephone and directed CS-1 to pay **WRIGHT** his share of the proceeds. CS-1 stated that **WRIGHT** uses telephone number **(443) 992-2067** to communicate with CS-1 about the bribery and fraud scheme.

23.     USPS invoice records indicate that during the period of October 17, 2007 to February 15, 2013 CS Landscaping invoiced the USPS for work at the Waverly Post Office 199 times for a total of $419,345.00.[3] Bank records for CS Landscaping indicate that from June 17, 2011 to October 1, 2012, CS-1 deposited 14 USPS checks totaling approximately $50,650 into his/her bank accounts. During the same time period, CS-1 wrote 14 checks payable to **WRIGHT** personally, totaling approximately $22,750.

24.     CS-1 indicated that he/she sometimes paid **WRIGHT** by cash or check, and that sometimes **WRIGHT** sometimes had CS-1 deposit money directly into **WRIGHT's** Bank of America **bank account no.** ██████**5070** ("\*\*\*\*\*\*\*\*5070"). I have reviewed records of that account, and it is held in the name of WRIGHT, and shows cash deposits as well as checks from CS-1.

25.     CS-1 also advised that **WRIGHT** had also introduced CS-1 to **Kimberly PARNELL**, the Station Manager for the Pikesville Post Office so that CS-1 and **PARNELL** could engage in the same bribery and fraud scheme as **WRIGHT** and CS-1. CS-1 advised investigators that a few years ago, **PARNELL** telephoned CS-1 and asked for an estimate for tree cutting at the Pikesville Post Office. CS-1 provided **PARNELL** with the estimate. After viewing the estimate, **PARNELL** told CS-1 that the estimate was low. **PARNELL** asked if she could receive money from the invoice that the USPS paid to CS Landscaping. CS-1 agreed and

---

[3]     In sharp contrast, from August 2005 to November 2007 (the period prior to **WRIGHT**'s control of the Waverly Station) the station spent only $4,258 for landscaping services.

PARNELL inflated the invoice amount.   Upon CS-1's receipt of USPS payments from PARNELL's Post Office, CS-1 paid a portion of the money to PARNELL.   CS-1 advised that he and PARNELL engaged in bribe payments on several occasions.

26.   A review of USPS records for Accounts Payable Activity indicated that from October 2010 to December 2012, CS Landscaping received 7 checks, totaling approximately $32,590.00, from PARNELL's Post Office.

### B.   Controlled Bribe Payments to Richard WRIGHT

#### February 20

27.   On February 20, 2013, CS-1 received a USPS check in the amount of $3,750 made out to CS Landscaping in his Post Office box.   According to CS-1, this check was for services ostensibly provided by CS Landscaping, but which were never actually provided, and the invoice was submitted by WRIGHT.   CS-1 provided the check to the FBI and advised that WRIGHT expected to receive a $2,000 bribe from the $3,750.

#### February 21-22

28.   During the period of February 21, 2013 to February 22, 2013, WRIGHT (using (443) 992-2067) and CS-1 communicated by text messages, which were observed by investigating agents, regarding the status of a USPS check and bribe payment.   One text message from WRIGHT to CS-1 contained the following communication:

> Yo bra u need to text or call me cause I need to get my loot! With this last two check ur getting! Mine is now 5700 and I need my loot! U always be screwing me up with ur bs! I need my loot!

According to CS-1, the "loot" to which WRIGHT was referring to the $2,000 that WRIGHT expected to receive from the check CS-1 obtained on February 20, 2013.

29.     On February 22, 2013, in the presence of law enforcement, CS-1 participated in a

consensually monitored and recorded telephone call to **WRIGHT**, using **(443) 992-2067**.  CS-1

and **WRIGHT** discussed meeting so CS-1 could pay **WRIGHT** the $2,000 bribe payment, how

much money CS-1 owed **WRIGHT**, and **WRIGHT**'s speculation that more USPS checks were

issued and mailed to CS-1's Post Office box. **WRIGHT** and CS-1 also discussed the dollar

amounts of invoices **WRIGHT** had submitted on behalf of CS Landscaping and the pending

USPS checks payable to CS Landscaping. The following is a partial transcript of CS-1's

conversation with **WRIGHT**, the recording of which was reviewed by investigating agents:

| | |
|---|---|
| CS-1: | Imma be up that way around 3 o'clock. |
| **WRIGHT**: | I got shit popping bra. [unintelligible] You got shit coming to your damn box and that's tonight. |
| CS-1: | Alright, I'll be up... |
| **WRIGHT**: | [unintelligible] There's probably something else in there now. |
| CS-1: | Oh really... |

Later in the conversation:

| | |
|---|---|
| **WRIGHT**: | You asked me about that 22, that 22 is off of that 17. I put like 17 in and hit you with another 3.  You got like 20, 20 within ah [unintelligible] |
| CS-1: | That was, that was for after the snow, that was for the sleet and freezing rain. I think you were in um the Super Bowl. |
| **WRIGHT**: | Yeah, and I came back. I turned around and put in 37, 37 again and I just did a 37 last week." |

30.     CS-1 advised that when **WRIGHT** stated a number, **WRIGHT** was referring to

dollar amounts of checks issued from the USPS to CS Landscaping. For example, "22" referred

to the dollar amount of $2,200 and "37" referred to pending USPS checks in the approximate

dollar amount of $3,700. CS-1 further advised that **WRIGHT**'s statement regarding "22" meant that **WRIGHT** expected to be paid of bribe of $2,200. CS-1 advised that the invoices they were discussing were false; CS Landscaping did not provide landscaping and snow removal services represented by either invoice.

31.     On February 22, 2013, CS-1 conducted a controlled bribe payment to **WRIGHT**. **WRIGHT** took the $2,000 cash bribe payment from CS-1. The controlled bribe payment was monitored by law enforcement officers and recorded. **WRIGHT** drove and arrived at the meeting location in a **green Chevrolet truck, Maryland Vehicle Administration license plate number 59R620.** During the meeting, **WRIGHT** asked CS-1 if CS-1 had other USPS checks and CS-1 stated that there should be "ten stacks." CS-1 later advised that "ten stacks" referred to $10,000 worth of USPS checks that were made payable to CS-1.

<u>February 25</u>

32.     On February 25, 2013, CS-1 received a text message from **WRIGHT**, using **(443) 992-2067.** The text message, which was observed by investigating agents, contained the following communication:

> Yo looking at invoices now total this month 25,052.46. Left my way now is 5450. I will be doing another one today for 3750 so added into what is left makes it 7200. U have 2 coming now for 3750 plus the one today for 3750 totaling 11250.

According to CS-1, **WRIGHT** was providing clarification on the amount of bribe money **WRIGHT** expected to receive based on invoices **WRIGHT** created and submitted to the USPS for payment to CS-1. CS-1 explained that **WRIGHT** was telling CS-1 in the text message that **WRIGHT** expected to receive a bribe payment of $7,200.

33.     During CS-1's cooperation, CS-1 has engaged in numerous consensually monitored telephone and text message conversations in the presence of law enforcement with **WRIGHT** using **(443) 992-2067** regarding **WRIGHT**'s submission of false CS Landscaping invoices and **WRIGHT**'s expectation of a bribe payment. The content and nature of CS-1 and **WRIGHT**'s the telephone, text message, and face to face conversations were similar to the telephone, text message and face to face conversations described above.

34.     Since February 20, 2013, pursuant to CS-1's work with the FBI and USPS OIG, the USPS has issued checks on the below-listed dates which resulted in controlled bribe payments. Prior to each bribe payment, **WRIGHT** and CS-1 contacted each other via text message and/or telephone call (which were observed or monitored by investigating agents) via **(443) 992-2067** to arrange bribe payment amounts and meetings.

| Date of USPS Check | Amount of USPS Check | Date of Bribe Payment | Amount of Bribe Payment |
|---|---|---|---|
| 2/13/13 | $ 3,750 | 2/22/13 | $ 2,000 |
| 2/25/13 | $ 3,750 | 3/7/13 | $ 2,400 |
| 3/4/13 | $ 3,750 | 3/18/13 | $ 2,400 |
| 3/7/13 | $ 3,750 | 3/26/13 | $ 2,400 |
| 4/2/13 | $ 6,250 | 4/12/13<br>4/29/13 | $ 1,000<br>$2,100 |
| 4/29/13 | $ 8,750 | 5/10/13<br>5/16/13 | $ 3,000<br>$1,250 |
| 5/20/13 | $ 7,020 | 6/4/13 | $ 3,000 |
| 5/30/13 | $4,500 | 6/14/13 | $3,750 |
| 6/25/13 | $7,300 | 7/08/13 | $5,400 |
| 7/10/13 | $8,000 | 7/25/13 | $4,000 |
| 8/06/13 | $5,500 | 8/22/13<br>8/28/13 | $2,000<br>$1,500 |
| | | **TOTAL** | $36,200 |

## E.    Controlled Bribe Payments to Kimberly PARNELL

### March 1

35.    On March 1, 2013, CS-1 participated in a telephone call with **PARNELL** over telephone number **(443) 992-0195**, which was consensually monitored and recorded by law enforcement.   During the call, CS-1 asked **PARNELL** if she was willing to continue to participate in their established bribe scheme.   **PARNELL** advised that she wanted to participate and agreed to that each would receive $2,000.   **PARNELL** advised CS-1 to create an invoice, dated in April.

### March 12

36.    On March 12, 2013, CS-1 participated in a controlled delivery to **PARNELL** of an invoice, dated in March, which charged **PARNELL**'s Post Office $4,000 for landscaping services which had not been performed.   The delivery was monitored and recorded by law enforcement.   On March 29, 2013, CS-1 participated in a telephone call with **PARNELL** at telephone number **(443) 992-0195**, that was consensually monitored and recorded by law enforcement.   **PARNELL** advised that she did not submit the invoice that CS-1 gave her on March 12, 2013 and directed CS-1 to create a new invoice dated in April.

### March 29

37.    On March 29, 2013, CS-1 created a new false invoice, dated in April, and sent a text message to **PARNELL**'s telephone to confirm **PARNELL**'s email address.   **PARNELL** replied via text message and confirmed her email address.   CS-1 emailed the invoice to **PARNELL**.   The invoice was dated April 2, 2013 and included the following description of work: "Trim vines and weeds form property line to include the strip mall and apartment side of the parking lot.   Clean all debris/trash from the aforementioned areas: Clean all leaves from

Page 15 of 52

parking lot area, Leaves will be bagged and disposed of." CS-1 did not provide any of the described services at the Pikesville Post Office.

### April 12

38.     On April 12, 2012, CS-1 participated in a controlled bribe payment to **WRIGHT** which was monitored and recorded by law enforcement.  During the meeting, **WRIGHT** told CS-1 that **WRIGHT** talked to "Kim" (referring to **PARNELL**) about how to process the CS Landscaping invoice so the USPS would not examine the invoice.  **WRIGHT** stated that he had plans to meet with **PARNELL** to show **PARNELL** what to do.

### April 17

39.     On April 17, 2013, CS-1 participated in a telephone call with **PARNELL** over telephone number **(443) 992-0195** that was consensually monitored and recorded by law enforcement.  **PARNELL** advised that she submitted the false invoice to the USPS for payment and expected the check to arrive at the end of the week or next week.

### April 22

40.     On April 26, 2013, CS-1 received a USPS check dated April 22, 2013.  The check was generated by a false invoice that **PARNELL** submitted on behalf of CS Landscaping.  The check was in the amount of $4,000 and mailed to CS-1's Post Office box via the USPS.

### April 29

41.     On April 29, 2013, CS-1 participated in a controlled bribe payment to **PARNELL** that was monitored and recorded.  CS-1 handed **PARNELL** a $2,000 bribe payment. **PARNELL** counted the money to ensure the total was $2,000. During the meeting CS-1 and

PARNELL discussed **WRIGHT**'s telephonic contact with **PARNELL**.   Below is a partial transcript of the conversation:

| | |
|---|---|
| CS-1: | Your boy be calling me, talking about take care of Kim. |
| PARNELL: | He called me the other day 'cause he asked me why I didn't give you no work.  And I said I am but I was waiting. I had the invoice, I was holding it because I didn't want [unintelligible].  It was too cool to me. |
| CS-1: | But you know he's trying to get something off of what we do. |
| PARNELL: | What? |
| CS-1: | Yeah, that's why, when you was like [unintelligible]. |
| PARNELL: | That's fine, normally I don't talk to him. |
| CS-1: | [unintelligible] You talked to Kim? And I was saying to myself, why you [unintelligible] and then he told me [unintelligible]. |
| PARNELL: | We'll he called me. |
| CS-1: | Then he told me [unintelligible], cause I owe him like 2 stacks, so… |
| PARNELL: | Oh. |
| CS-1: | I told him that when I get something from, I didn't really say who, I said another spot where I'm doing something [unintelligible]. |
| PARNELL: | Oh, maybe that's when he called me.  He was like when you going to give [CS-1] some work? |

Further in the conversation:

| | |
|---|---|
| PARNELL: | I thought you might have went to him because I was taking long with the invoice. |
| CS-1: | Nuh-uh. mm-mm. |
| PARNELL: | Oh well, then he played my ass. |

42.    I believe, based on my training and experience, and the investigation to date, that during the above conversation, **PARNELL** advised CS-1 that **WRIGHT** telephoned her to inquire about the CS-1's work status and the status of **PARNELL**'s submission of CS-1's invoice.  CS-1's reference to "2 stacks" was to a $2,000 bribe payment that CS-1 owed **WRIGHT**.

<u>June 10</u>

43.    On June 10, 2013 at 8:05am, **WRIGHT** used **(443) 992-2067** to send a text message to CS-1 stating: "Good am. Leave 4500 check today so I can cash today."   That same day at 9:53am, **WRIGHT** used **(443) 992-2067** to send another text message to CS-1 stating: "Good am. Leave 4500 check today so I can cash today."   Again, at 11:35am, **WRIGHT** used **(443) 992-2067** to send a text message to stating: "Good am. Leave 4500 check today so I can cash today."

44.    On June 10, 2013, at approximately 12:32pm, CS-1 participated in a consensually monitored and recorded telephone call to **(443) 992-2067** and spoke with **WRIGHT**. The call to **WRIGHT** was verified by law enforcement agents observing the call dialed by CS-1.  CS-1 advised that his bank put a hold on the checks and the funds will be available on June 13, 2013.

45.    On June 10, 2013 at 12:35pm, CS-1 sent a text message to **PARNELL** on telephone number **(443) 992-0195** regarding the status of the bribe payment.  CS-1 and **PARNELL** exchanged text messages from 12:35 pm to approximately 1:49 pm.  The text message exchange between **PARNELL** and CS-1 contained the following comments:

CS-1:          Hey I deposit the check... The fund will be available on
               thurs...How much do I owe you...

PARNELL:    25, Ill have to meet u early thurs cuz I have some place I habe to
               be by 11 and I to take that to them bus that cool. Is that cool.

Why they start holding

CS-1:          It won't be cleared until 5 pm u want to do Friday morning..

**PARNELL**:   Why so long

CS-1:          I think because I put your and Richards in at the same time..."

**PARNELL**:   I know u got 25 laying around.Lol"

CS-1:          Lmao..Hands tied Down!!!

**PARNELL**:   Can u put it in my account Friday?

46.     Based on **PARNELL**'s acknowledgment of a payment due to "Richard," referring to Richard **WRIGHT**, I believe that she is aware that **WRIGHT** was also expecting a bribe payment from CS-1.

### June 13

47.     On June 13, 2013 at 9:23am, **WRIGHT** used **(443) 992-2067** to send a text message to CS-1. The text message stated, "Good am what time today!" On June 13, 2013 at 11:17am, CS-1 sent a text message, which was observed by law enforcement agents, to **(443) 992-2067** stating:

> Hey I got called in because of the storm[4]...And the whole deposit
> will not clear until later today... I will bring u yours first thing in
> the am...I gotchu...

48.     Fifteen minutes later, at 11:32am, **WRIGHT** used **(443) 992-2067** to send a text message to CS-1 stating:

> First thing tomorrow. Why don't u just leave a check and I can
> cash tomorrow! Don't bs me man! Need my loot and Kim too! Call
> u and texted no answer! Ur business is bout to be cut off bra

---

[4]     A large system of thunderstorms hit the Washington, D.C. to Baltimore area on June 13, 2013. *See* http://www.washingtonpost.com/blogs/capital-weather-gang/wp/2013/06/14/june-13-2013-severe-weather-hypestorm-or-the-real-deal/

49.     On June 13, 2013 at 9:36 am, **PARNELL** used telephone number **(443) 992-0195**

to send a text message to CS-1. The text message stated:

> Hey there. Your check cleared on the 11th. I need that today. I
> have something very very important I have to take care of. Call
> me! You told me they were holding it til tonight. No hate to think
> you Tryna Bs me. Call me back

50.     I have been advised by the USPS OIG that **PARNELL** is able to monitor when

the checks issued by USPS clear into CS-1's account, and was monitoring to see when the check

for $5,600 cleared so that she could get her bribe payment from CS-1.

<u>June 14</u>

51.     On June 14, 2013, at approximately 9:49am, in a call which was consensually

monitored and recorded, CS-1 called **PARNELL** on telephone number **(443) 992-0195**

regarding the payment of a bribe in the amount of $2,500. Law enforcement agents verified the

call to **PARNELL** by listening to the recording of the call. **PARNELL** advised that she was at

her son's graduation in Chicago and instructed CS-1 to put the money into her bank account. On

June 14, 2013, at 9:51 am, **PARNELL** sent a text message to CS-1. The text message stated:

> Gm Just put it in my Bank of America ac ct. ill give u my info
> when u get there. Thanks, Kimberly **PARNELL** ch
> acct# ████████2722 Bank of America. Text me when it's done.
> Thanks.

52.     I have learned that PARNELL has a **Bank of America bank account no.**

████████**2722 ("\*\*\*\*\*\*\*\*2722")**. On June 14, 2013 at approximately 10:19 am, CS-1, at the

direction of law enforcement, deposited a bribe payment of $2,500 into **PARNELL's** Bank of

America account, as directed by the above text message. CS-1 sent **PARNELL** a text message

advising that he deposited the funds. **PARNELL** replied, "Thanks."

53.    On June 14, 2013, CS-1 participated in a bribe payment that was controlled by the FBI, and gave **WRIGHT** $3,750. During the June 14, 2013 bribe meeting, **WRIGHT** told CS-1 that whenever **PARNELL** reaches out to CS-1 and CS-1 does not answer, **PARNELL** telephones **WRIGHT**.   **PARNELL** had contacted **WRIGHT** because she was scared and nervous.   CS-1 advised the FBI that in the past, **PARNELL** had made comments to him indicating that she was fearful of being caught.

54.    I believe, based on that contact and **WRIGHT**'s June 13, 2013, 11:32 am text message to CS-1, in which **WRIGHT** wrote, "Need my loot and Kim too!", that **WRIGHT** communicated with **PARNELL** prior to texting CS-1 to discuss the status of his and **PARNELL**'s bribe money.   On June 14, 2013 at approximately 10:04 am, **WRIGHT**, using **(443) 992-2067**, sent a text message to **PARNELL** at **(443) 992-0195**. The June 14, 2013 call occurred shortly before CS-1 deposited a bribe payment into **PARNELL**'s bank account and CS-1 paid **WRIGHT** a bribe.   I believe that **WRIGHT** and **PARNELL** contacted each other regarding bribes from CS-1.

55.    On August 21, 2013, at approximately 2:18 pm, **WRIGHT**, using **(443) 992-2067**, called CS-1 and left the following voice mail message:

> What is going on wit chu?  You say you gonna do this you don't do
> it man.  You burning bridges like a mafucka, bra.  Put my money
> in my account today man.  I don't have time to keep waiting on you
> to get around to it, put my money in there.  You got your money, I
> need to get my loot man.  I don't know what your problem is, but I
> need to get my cash man, real talk.

### August 22

56.    On August 22, 2013, at approximately 11:24 am, **WRIGHT**, using **(443) 992-2067**, CS-1.  **WRIGHT** left the following voice mail message:

> Hey Chief, where...where my money at man?  You ain't answer text, you ain't answer phone call, where my money at?  I know you got some money.  Hope you ain't took my money and spent my money man, I need my $3500 a week ago.  But what game you playing, I want my money man, you playing too many games.  That's why don't nobody wanna deal wit chu yo, real talk, you need to get that money in my account today, I need my money.  [unintelligible] how more to tell ya, how more to text you.  I ain't texting you no more, I want my money.

57.     On August 22, 2013, at approximately 7:30 am, **WRIGHT**, using **(443) 992-2067**, sent a text message to CS-1 stating, "Deposit my money and stop holding me up TODAY!"  I am aware, through USPS computer systems, that **WRIGHT** checked the USPS check distribution center and determined that a USPS check in the amount of $5,500 was issued to CS-1 on August 6, 2013.

58.     On August 22, 2013, at approximately 12:44 pm, under the surveillance of FBI Agents, CS-1 deposited $2,000 (of the $3,500 bribe payment that **WRIGHT** requested) into **WRIGHT's bank account no. ********5070**, as directed by **WRIGHT** in the earlier text message.  After depositing the funds, CS-1 telephoned **WRIGHT** at **(443) 992-2067** and participated in a consensually monitored telephone.  During the telephone call, CS-1 advised **WRIGHT** that the remaining $1,500 of the bribe payment would be available the following Wednesday.

### C.    WRIGHT and PARNELL Replace CS-1 with Shane ANDERSON in the Bribery and Fraud Scheme

#### July 22

59.     On July 22, 2013 at approximately 11:20 am, investigating agents observed a meeting in Baltimore, MD among **WRIGHT**, **PARNELL** and a male, later identified as Shane

ANDERSON.[5]  **WRIGHT, PARNELL** and **ANDERSON** were seen talking to each other until approximately 12:19 pm.  At approximately 11:58 am (during the meeting) **WRIGHT**, using **(443) 992-2067**, called telephone number **(443) 324-5002**, subscribed to Shane **ANDERSON**. No conversation occurred during this call. It is believed that **WRIGHT** made this telephone call in the presence of **ANDERSON**, during the July 22, 2013 meeting, so that **WRIGHT** could save **ANDERSON**'s telephone number in his telephone contacts. 🟊

    60.    On July 22, 2013 at approximately 12:13 pm, **WRIGHT**, using **(443) 992-2067** called CS-1.  **WRIGHT** left the following voice mail message:

> Yo, remember the conversation we had a couple months ago and I told you about fuckin' up?  That's what you're doing now, fuckin' up.  Not answering my phone calls, not Kim's phone calls.  Yo, no problem but check this out.  I need my money.  I told you that last week, week before day with all these damn texts.  Not texting no more.  Bro you owe me money, what my money.  Tired playing games witch you.  So, like I say, I expect to hear from you today. If not, no problem I know where you at I come and find you.  We go from there I want my money.

<u>July 25</u>

    61.    On July 25, 2013, at approximately 12:05 pm, **WRIGHT**, using **(443) 992-2067**, called telephone number **(443) 992-0195** used by **PARNELL**.  The following is a transcript of a portion of the telephone conversation:

**PARNELL:**    Hello

**WRIGHT:**    Yea, hey, what's old boy, what's old boy information again what's his name?

**PARNELL:**    Shane.

**WRIGHT:**    Shane, Shane, Shane.

---

[5]    During the surveillance, **WRIGHT** and **PARNELL** met with the driver of a black BMW bearing Maryland license plate 6AZ1487.  This vehicle is registered to Shane Roland **ANDERSON**.

*🟊 Wright was seen by law enforcement officers driving and arriving at several CHS meetings in the 2004 Green Chevrolet truck license plate number 59R620.*

PARNELL:    Uh.

WRIGHT:     Aight.

PARNELL:    Shane, uh.

WRIGHT:     Did you send [unintelligible] on him?

PARNELL:    Nah, I'm waiting for him to give me the W-9 back.  I went out
            there looking for him a little while ago and he wasn't back yet.  I'm
            waiting for him to give me the W-9, he need to come on so I can
            get it in the mail.  I'm, I got all my stuff just waiting, just waiting
            for ...

WRIGHT:     You waiting on him.

PARNELL:    Yea.

WRIGHT:     Well yea, soon as I get back I'm a pop some shit off.  Fucking, still
            waiting on dick head.  He finally, he ain't call me all day like I
            said.  I'm like yo, alright what's going on?   I had to deal with my
            mom and all that.  Alright, that's understandable yo, what's up wit
            my money.

62.     I believe that in this conversation, **WRIGHT** and **PARNELL** discussed using
Shane **ANDERSON** instead of CS-1 in their bribery and fraud scheme.


### August 9

63.     On August 9, 2013, at approximately 9:59 am, **WRIGHT** used **(443) 992-2067**
to schedule a meeting with **ANDERSON**.  It is believe that **ANDERSON** met **WRIGHT** to
provide **WRIGHT** with an estimate for work to be completed at **WRIGHT**'s post office. After
**WRIGHT**'s meeting with **ANDERSON**, on August 9, 2013, at approximately 3:49 pm,
**ANDERSON**, using telephone number **(443) 324-5002** telephoned **WRIGHT** at **(443) 992-2067**
number. The following is a transcript of a of the telephone conversation:

WRIGHT:     Hello.

**ANDERSON:** Yea Rich.

**WRIGHT:** Yea, yea whichacallem he, he gotta know ah, he gotta know what your operating cost is and what ya, what ya trying to make off the deal.

**ANDERSON:** [Unintelligible]

**WRIGHT:** $6,000, is, is, is no room for me really maneuver into cost wise what I wanna get, and, and, and the thing is, I you know, I don't know what it's gonna cost you to get your guys to do whatever, but I don't . . .

**ANDERSON:** Yea, I mean [unintelligible].

**WRIGHT:** Yea, my guys he ain't getting no $6000.

**ANDERSON:** I mean which would, yea, I feel you.  What you unusually pay 'em?

**WRIGHT:** Well depends on what's going on,  I mean, you, you tell me a cost and then I'll manipulate stuff around the cost that you say that you trying to get out of work.  See, you see, see what I'm saying?

**ANDERSON:** Ok, I see what ya saying.

**WRIGHT:** You gotta know what, what, what you saying.  Aight, I got x amount of guys coming to do this, it might cost me a 1000 and I want to make a 1000 myself, so here's my cost of 2000, 2500, 3000 something like that and then I maneuver the shit around to make sure that you get what che,

**ANDERSON:** Shit yea.

**WRIGHT:** What ya asking for and imma get what imma get.

**ANDERSON:** Ok, I mean that's fair, cause I mean cause I, I, I got 3, let me see 3, 3 dudes, um.

**WRIGHT:** OK, I mean you need, nah, you need to think about it a little bit more just think about it, but I mean you gotta remember that you'll get your cost, imma get mine.

ANDERSON: Aight, got ya, got ya, got ya, ok.

WRIGHT:    Ok, let me know.

ANDERSON: So I hit ya back [unintelligible] I'll let ya know.

WRIGHT:    Ok.

ANDERSON: Aight.

<u>August 14</u>

64.     On August 14, 2013, at approximately 2:14 pm, **ANDERSON**, using telephone number **(443) 342-5002**, telephoned **WRIGHT** at **(443) 992-2067**. **ANDERSON** advised **WRIGHT** that **ANDERSON**'s landscaping employees were at the Waverly Post Office. Also on August 14, at approximately 2:11 pm, video surveillance at the Waverly Post Office showed two male landscapers were seen providing landscaping services.

<u>August 20</u>

65.     On August 20, 2013, at approximately 10:43 am, **WRIGHT** ("**WRIGHT**") using **(443) 992-2067**, called **(443) 992-0195**, a telephone number used by Kimberly **PARNELL** ("**PARNELL**"). The following is a transcript of a portion of the telephone conversation:

WRIGHT:    Oh ok. Yea, whicha call em, Yea whicha call em. I'm Fuc, still
           waiting on fucking dick head. Like yo, I got $3,500 more to get
           from him.

PARNELL:   You still.

WRIGHT:    Yea. Mafucker yo he he still playing that playing the fucking uh,
           "I'll put it in a bank and it'll like a week to clear". I'm like man get
           the fuck out of here yo that shit is like a government check. Fuck is
           wrong with you?

PARNELL:   [unintelligible]

**WRIGHT:** [unintelligible] I mean who, who, who you think really believes that dumb shit?

66.     I believe that in this call, **WRIGHT** and **PARNELL** were discussing delays in receiving bribe payments from CS-1 who has been involved with them in their bribery scheme at the direction of law enforcement and about replacing CS-1 with Shane **ANDERSON**, who engaged in the same bribe scheme to provide landscaping services at their post offices and submit and/or create inflated and/or false invoices in exchange for a bribe payment upon receipt of payment from the USPS. During the conversation **WRIGHT** and **PARNELL** state that **ANDERSON** completed landscaping work at **WRIGHT** and **PARNELL**'s post offices and **ANDERSON** paid **PARNELL** a bribe payment.

67.     During the period of August 7, 2013 to August 22, 12013, **WRIGHT** sent numerous text messages to CS-1 requesting his bribe payment of $3,500. On August 21, 2013, at approximately 10:55 am, **WRIGHT**, using (443) 992-2067, sent a text message to CS-1 providing information regarding **WRIGHT**'s bank account, so CS-1 could deposit the $3500 bribe payment into **WRIGHT**'s bank account. The text message stated, "**WRIGHT** Way Cleaning Service ▮▮▮▮▮▮ 5070. Bank of America."[6]

68.     On August 21, 2013, a query of the USPS database for invoices associated with Shane **ANDERSON** and telephone number (443) 342-5002 indicated that on August 10, 2013, **WRIGHT** submitted an invoice to the USPS, in the amount of $8,600 on behalf of Shane **ANDERSON**'s business titled, "Youthful Minds Lawncare, 1716 Newcastle Rd, Baltimore,

---

[6]     Wright Way Cleaning Service, Dept. ID #T0013595 1 originally had a trade name registration with the state of Maryland on December 14, 1999, with a certificate of renewal on August 13, 2004, but the registration lapsed on January 18, 2010 and the current status is forfeited. The listed address for Wright Way Cleaning Service is 1227 Waterview Way, Baltimore, MD 21221, **WRIGHT**'s home address.

MD, 21244-1702" The invoice indicated that landscaping services were provided at the Waverly Post Office.

August 22

69.     On August 22, 2013, at approximately 10:49 am, **WRIGHT**, using **(443) 992-2067**, called telephone number **(443) 324-5002**, used by **ANDERSON**.   The following is a portion of the conversation:

**ANDERSON:** What's up fella?

**WRIGHT:**     Hey, what's going on brotha

**ANDERSON:** Ain't nothing

**WRIGHT:**     Hey check this out, ahh the mothafucka check is in the pipe ahh went out the 21st so probably maybe...maybe Saturday.

**ANDERSON:** OK

70.     I believe that in this phone call, **WRIGHT** was advising **ANDERSON** of the status of the USPS check payable to **ANDERSON**, for the work of August 14, as part of their bribery scheme.

August 27

71.     On August 27, 2013, at approximately 10:57 am, Shane **ANDERSON**, using telephone number (443) 342-5002, sent a text message to **WRIGHT**, using **(443) 992-2067**, stating: "Bout to pull up."   At approximately 10:58 am, **ANDERSON** sent a text message to **WRIGHT** stating, "Coming down loch raven." At approximately 10:59 am, **ANDERSON** sent a text message to **WRIGHT** stating, "I'm outside."

72.     I believe that **ANDERSON** advised **WRIGHT** of **ANDERSON**'s location because they planned to meet so **ANDERSON** could pay **WRIGHT** a bribe payment from the

Page 28 of 52

USPS check that **WRIGHT** discussed with **ANDERSON** during an August 22, 2013 telephone call.

73. On August 27, 2013, at approximately 10:57 am, video surveillance at the Waverly Post Office shows an African-American male adult, believed to be **WRIGHT**, exiting the post office building and a black BMW sedan with tinted windows driving into the post office station parking lot toward **WRIGHT**'s direction. At approximately 10:58 am, **WRIGHT** and an African-American adult male, believe to be Shane **ANDERSON**, walked to a white van, stood near the van and walked in the direction from which they came. At approximately 10:59 am, **WRIGHT** was seen walking in the area of the van and a black BMW pulled up to **WRIGHT**. **ANDERSON** then reached out of the driver's side window, appeared to hand **WRIGHT** an item and then drove out of the parking lot.

74. The chart below summarizes the services provided by ANDERSON for **WRIGHT** and PARNELL, the invoices submitted and the checks issued.

| Service Date | Invoice Date | Invoice Amount | Invoice Submitted By | Check Issued Date | Check Issued Amount |
|---|---|---|---|---|---|
| 07/23/2103 | 07/23/2013 | $6,120 | **PARNELL** | 08/05/2013 | $6,120 |
| 07/26/2013 | 07/26/2013 | $900 | **PARNELL** | 07/26/2013 | $900 |
| 08/10/2013 | 8/10/2013 | $ 8,600 | **WRIGHT** | 08/21/2013 | $8,600 |
| 08/27/2103 | 08/27/2103 | $700 | **WRIGHT** | 08/27/2013 | $700 |
| 09/06/2013 | 09/06/2013 | $5500 | **PARNELL** | 09/06/2013 | $5,500 |
| | | | | **TOTAL** | **$21,820** |

**D.**     **Bribery Scheme with SKETERS and KEEP U CLEAN**

75. Based on the evidence in the investigation to date, I submit that there is probable cause to believe that **WRIGHT** and **PARNELL** have used Ladena **SKETERS** and her cleaning company to further their bribery and wire fraud scheme.

### 1.    SKETERS' Connection to WRIGHT

76.    On February 1, 2013 surveillance of **WRIGHT**'s home located at 1227 Waterview Way, Essex, MD revealed that a vehicle registered to "Skeet**WRIGHT** Comm cleaning Service c/o R **WRIGHT** and L Skeeters, 1227 Waterview Way, PO Box 1673, Baltimore, MD, 21221" was parked outside of **WRIGHT**'s home. I believe, based on my training, experience, and review of records in this case, that **WRIGHT** is closely associated with SKEETERS and may be **SKETERS**' Keep U Clean business partner.

77.    From August 2010 to the end of May, 2013, **SKETERS**' company, Keep U Clean, invoiced the USPS approximately 82 times for a total of $177,817.60 for custodial services such as waxing and black topping Post Office floors. Waverly Station, under **WRIGHT**'s control, submitted approximately 45 of the 82 invoices, for a total of approximately $86,826.30.

78.    Bank records for Ladena **SKETERS** ANDERSON, dba Keep U Clean Janitorial Service revealed that during the period of January 7, 2013 to April 9, 2013, Keep U Clean received 4 checks from the USPS for a total of $14,300. The checks were deposited on January 7, 2013, February 4, 2013, April 4, 2013 and April 5, 2013. **SKETERS** then issued four checks on January 9, 2013, February 6, 2013, April 8, 2013 and April 9, 2013 to **WRIGHT** Way Cleaning Services, totaling $13,000. The checks issued to **WRIGHT** Way Cleaning were indorsed by Richard **WRIGHT**.

79.    Based on **SKETERS**' pattern of receiving a USPS payments (approved by **WRIGHT** for services allegedly provided at **WRIGHT**'s Post Office), depositing the USPS checks into her account and issuing checks to **WRIGHT** Way Cleaning that were indorsed by

WRIGHT, I believe that **SKETERS** and **WRIGHT** are engaged in a bribe scheme to provide **WRIGHT** with a bribe payment to **SKETERS** from USPS.

80.    On April 12, 2013, CS-1 participated in a controlled bribe payment to **WRIGHT** that was monitored and recorded by law enforcement. During the meeting, **WRIGHT** told CS-1 that **WRIGHT** received an IRS Form 1099 from his cleaning business partner, who is a female. **WRIGHT** also stated that his cleaning business was in his partner's name and his partner received ten percent from each job. **WRIGHT** stated that he planned to use his cleaning company to clean the floors at **PARNELL**'s Post Office. **WRIGHT** stated that he planned to "beat her across the head with the price" for floor cleaning.

81.    On May 21, 2013, CS-1 participated in a face to face conversation with **PARNELL** that was monitored and recorded by law enforcement.   CS-1 and **PARNELL** discussed **WRIGHT**'s contact with **PARNELL**.  **PARNELL** advised that **WRIGHT** was "crazy" and had something that he was trying to get her to do.  CS-1 asked **PARNELL** if **WRIGHT** was trying to get **PARNELL** to do something like they were doing.  **PARNELL** replied that it was not "grass" (a reference to the scheme using landscaping services), but that it was something "inside" the Post Office.  **PARNELL** commented that **WRIGHT** was "trying to get a dollar off of every God damn thing."   I believe that in this conversation **PARNELL** was referencing the established bribe scheme involving CS-1, **WRIGHT** and landscaping services, and was telling CS-1 that **WRIGHT** was attempting to convince **PARNELL** to enter into a similar bribe scheme involving Keep U Clean, **SKETERS** and **WRIGHT** when she stated that it involved something "inside."

82.    On May 30, 2013, CS-1 participated in a face to face conversation with **PARNELL** that was monitored and recorded by law enforcement. During the conversation,

Page 31 of 52

PARNELL advised that **WRIGHT**'s business partner is "Dena." **PARNELL** stated that "Dena" was doing something with **WRIGHT** that involved cleaning the floors at the Pikesville Post Office. I believe this is an additional reference to **PARNELL**'s bribe scheme involving Keep U Clean, **SKETERS** and **WRIGHT**, and that "Dena" is short for "Ladena."

### August 16

83.   On August 16, 2013, the USPS issued three checks in the amounts of $2,750, $3,250 and $550 to Keep U Clean Janitorial Service, based on invoices submitted by **WRIGHT** for "waxing of workroom floor," "blacktopping of workroom floor" and "strip and wax of lobby area" completed on August 10, 2013 at the **WRIGHT**'s post office station located at the Waverly Post Office.

### August 21

84.   On August 21, 2013, at approximately 12:10 pm, **WRIGHT**, using **(443) 992-2067**,[7] sent a text message to Ladena **SKETERS** using telephone number **(410) 740-1439** stating, "Good am! Heard u yesterday got a ck in pipe now coming ur way! Pull 500 for urself off rest in cash my way! Mailed out yesterday should be here Friday or Saturday"  At approximately 12:57 pm, **SKETERS** using telephone number **(410) 740-1439** sent a text message to **WRIGHT** at **(443) 992-2067**, the text message stated, " Ok."

85.   I believe that **WRIGHT** was advising **SKETERS** that he had submitted an invoice to the USPS on behalf of **SKETERS**'s cleaning company, Keep-U-Clean, and that a check payable to Keep-U-Clean was to be issued to **SKETERS**. **WRIGHT** instructed

---

[7]      On July 16, 2013 the Honorable William D. Quarles of the United States District Court for the District of Maryland signed an order authorizing the interception of wire and electronic communications occurring over (443) 992-2067.  Interceptions pursuant to this order began on July 16, 2013, and are continuing, pursuant to subsequent orders of Judge Quarles.

SKETERS to keep $500 for herself and provide a bribe payment to **WRIGHT** for the remainder of the USPS check dollar amount.

### 2.    PARNELL's Use of SKETERS

86.    On June 6, 2013 at 9:28 am, **PARNELL** used telephone number **(443) 992-0195** to send a text message to CS-1 inquiring about CS-1's receipt of a USPS check. The text message stated, "The other persons came and cashed. Check early today and let me know so I can call the payment center and see what's up."    USPS records for Accounts Payable Activity indicated that on May 20, 2013, **PARNELL** submitted a payment request for two Keep U Clean invoices. The Keep U Clean invoices indicated that waxing and black topping services were provided to the floor on May 11, 2013 and the total charge was $6,000. A USPS check in the amount of $6,000 payable to Keep U Clean was generated on May 28, 2013.

87.    On August 27, 2013, at approximately 9:42 am, **WRIGHT**, using **(443) 992-2067**, sent a text message to telephone number **(443) 992-0195**, used by Kimberly **PARNELL**, stating, "Lil sis u going to do any floor invoices?" I believe that **WRIGHT** was prompting **PARNELL** to use Ladena **SKETERS**'s cleaning business Keep-U-Clean and submit a false or inflated floor cleaning service invoices to the USPS in exchange for a bribe payment to **WRIGHT** and/or **PARNELL**.

88.    On September 11, 2013, at approximately 3:21pm, **WRIGHT** sent **PARNELL** a text message stating, "No dates yet." On September 12, 2013, at approximately 10:21 am, **PARNELL** sent **WRIGHT** a text message stating, "Mailed yesterday."

89.    On September 12, 2013, a query of the USPS database for invoices associated with Keep-U-Clean indicated that on September 11, 2013 a USPS check in the amount of $4,050

Page 33 of 52

was issued to Keep-U-Clean Janitorial Services. The check request was submitted from the Pikesville Post Office.

90.     On September 15, 2013 at approximately 9:37 am, **WRIGHT**, using the Target Telephone, sent a text messages to telephone number **(443) 740-1439** used by Ladena **SKETERS** stating: " Good am! How r u! The check was 4050 correct?" At approximately 9:38 am, **SKETERS** replied via text message, "Good morning yes." At approximately 9:39 am **WRIGHT** responded via text message, "Ok take that for urself and ill do the final numbers today and let u no how much more u have coming!" At approximately 9:58 am **SKETERS** replied via text message, "Ok, enjoy the game." At approximately 10:26 pm, WRIGHT sent a text message to **SKETERS** stating, "13 making your grand total due to u of $1896.32. I should get the check he said he mailed out Saturday tomorrow I will put in bank and send Out ur remainder Tuesday."

91.     I believe that **WRIGHT's** August 27, 2013 and September 11, 2013 text messages to **PARNELL** were inquiries about **SKETERS-'s** and **PARNELL's** submission of false or inflated floor cleaning service invoice to the USPS in exchange for a bribe payment to **WRIGHT** and/or **PARNELL**. I believe that **PARNELL's** September 12, 2013 text message to **WRIGHT** communicated to Wright that the USPS had mailed a check to Keep-U-Clean on September 11, 2013. I further believe that **WRIGHT's** and **SKETERS**, September 15, 2013 text messages refer to a United States Postal Service (USPS) check that **SKETERS's** business Keep-Up-Clean received in the amount of $4050 for cleaning services allegedly provided at Kimberly **PARNELL's** post office. Additionally, I believe that **WRIGHT** was advising **SKETERS** that she would receive a check from **WRIGHT** in the amount of $1,896.32, after he went to the bank, in exchange for a bribe payment to **WRIGHT** and/or **PARNELL**.

E.   **Calls Related to Drug Trafficking**

92.     During the course of the investigation, the intercepted telephone calls have indicated that **WRIGHT** is engaged in the sale of narcotics, specifically marijuana.

<u>July 17</u>

93.     On July 17, 2013, at 3:26 pm, WRIGHT, using **(443) 992-2067**, received an incoming call from an unidentified female using telephone number (443) 559-2568 (referred to herein as "UF 2568"). The following is a portion of the transcript of the conversation between **WRIGHT** ("**WRIGHT**") and UF 2568:

UF 2568:     I said I can either catch a cab back up or I can just jump on the bus.

**WRIGHT**:     Naw don't get on the bus with that. It's gonna smell.

UF 2568:     No I have um, I brought some bags and stuff, um some smell bags from work.

**WRIGHT**:     Alright look, what I want you to do if you get in there, I'm gonna tell him to let you in…. Take that chair over, stand on the chair and go up top and slide the closet over and there's a black bag in there. Pull the bag down and take out one of the bags that's in there. Two of them, and there's eight in each one.

UF 2568:     Okay

**WRIGHT**:     So take and put the plastic bags back up there. Take the duffel bag with you, put eight in it and put it inside your stuff and that will help keep them from smelling.

UF 2568:     Okay

**WRIGHT**:     [Unintelligible] Kyle what he saying. I'm not handing nothing to him without money. He gots have money.

94.     At approximately 4:09 pm, WRIGHT, utilizing **(443) 992-2067**, received an incoming telephone call from UF 2568, using telephone number (443) 559-2568. During the conversation, **WRIGHT** directs UF 2568 on how to recover eight bags from a closet and

Page 35 of 52

explained how UF 2568 should package the bags, so the bags will not smell. **WRIGHT** advised UF 2568 that he will tell "Kyle" that UF 2568 had the bags now and if Kyle does not have any money, the UF should sit on the eight bags.

95.    At approximately 6:22 pm, WRIGHT, using **(443) 992-2067**, received an incoming telephone call from an unidentified male using telephone number (443) 360-7518 (referred to herein as "UM 7518"). During the conversation, UM 7518 advised **WRIGHT** that he needed "one" now, and maybe "two" later. UM 7518 advised **WRIGHT** that the "one" was for his neighbor. **WRIGHT** advised UM 7518 that he would send a female to provide marijuana to UM 7518 to sell to his neighbor.

<u>July 18</u>

96.    On July 18, 2013, at approximately 8:47 am, WRIGHT, using **(443) 992-2067**, received an incoming telephone call from an unidentified female using telephone number (443) 559-2568 (referred to herein as "UF 2568"). During the conversation, UF 2568 advised **WRIGHT** that she was at his home and asked directions on which pot on WRIGT's grill she needed to look under. **WRIGHT** instructed UF 2568 to look under the black pot and asked UF 2568 if she had a scale.

97.    Based on my training, experience and the above interception, I believe **WRIGHT** was instructing UF 2568 on how to package and move a quantity of narcotics. I further believe that **WRIGHT** was requesting UF 2568 to collect money from a male named Kyle in exchange for providing narcotics to Kyle.

<u>July 19</u>

98.    On July 19, 2013, at approximately 9:19 pm, WRIGHT, using **(443) 992-2067**, sent a text message to telephone number (254) 245-4721, stating, "Yo what up? Can il get two

Page 36 of 52

reg and 1 fire 4 stacks for all!" At approximately 9:38 pm, the user replied by text message to **WRIGHT** stating, "I can't do nothing for u wit that number." At approximately 9:42 pm, **WRIGHT** sent the user of (254) 245-4721 a text message stating, "Ared so what kind of number u talking?"

99.     Based on training, experience and other interceptions, law enforcement officers believe that **WRIGHT** was discussing the sale of narcotics, believed to be marijuana. Law enforcement officers further believe that when the conversation included terms such as, "reg" and "fire," **WRIGHT** was referring to slang terms used to describe marijuana, with "reg" meaning "regular" marijuana and "fire" meaning high quality marijuana. Additionally when **WRIGHT** used the term "4 stacks," **WRIGHT** was referring to the dollar amount of $4,000.

August 1

100.    On August 1, 2013 at approximately 2:26 pm, an individual using telephone number (202) 977-9830 (UM 9830) to call **WRIGHT** on **(443) 992-2067**. The following is a transcript of a portion of the telephone conversation:

| | |
|---|---|
| **WRIGHT:** | Hello? |
| UM 9830: | Yo. |
| **WRIGHT:** | Hey what up. |
| UM 9830: | You hear me? |
| **WRIGHT:** | What's up? |
| UM 9830: | Naw I got one sour. I got some OG too, but I got one sour, I know you fuck with that shit. |
| **WRIGHT:** | Yep, yep, yep, yep, yep. What, what, what, what's the half? |
| UM 9830: | I can't do nothing but 4. I got you for the 4 on that. But the OG shit I can do for 39 though. |

**WRIGHT:**   OG, nah give me, give me give me the sour. Give me half of that joint.

UM 9830:   You said you want a half of sour?

**WRIGHT:**   Yea that's all I got right now. Whatcha call em, I need to, well you know what. How, how long will it take you?

UM 9830:   To me I, I mean, I, I just got to go to my house and break it down cause I got to break it down for you.

**WRIGHT:**   Alright shit. I know I need a motherfucking, hey that's what I got on me right now.

UM 9830:   I mean alright you can get, you, you can get the half I just can't, I mean I'll go ahead and do the two for you since but other than that its alot of work for me I got to go all the way home break it down and then come all the way back to you so I mean, you, you know I could do that for you if that's that's what you need me to do just cause I know you that's what you fuck with.

**WRIGHT:**   But you, but you, you, you, you'll, you'll, you'll throw the whole joint out there for four.

UM 9830:   Yea I'll do the whole joint for four my nigga you know what I'm saying. That's for you though, that's for you, like I just sold five of them right now for 43. Just now. Nigga gonna have all the sours he only left me with one sour left.

**WRIGHT:**   Alright, well... I'll tell you what give me a few minutes I'ma call you right back I'll probably take just go ahead and take the whole thing.

UM 9830:   Alright make sure you call me right back.

**WRIGHT:**   Alright.

101.   Based on training, experience and other interceptions, I believe UM 9830 was calling **WRIGHT** to inquire if **WRIGHT** was interested in purchasing two different types of marijuana. I further know that the term "OG" is a term for a type of marijuana and "Sour" is also a term for a strong type of marijuana. I believe UM 9830 was offering to sell **WRIGHT**

Page 38 of 52

"OG" marijuana for $3,900 per pound or "Sour" marijuana for $3,900 per pound. **WRIGHT**

initially only wanted to purchase a half pound but then reconsidered and purchased a pound.

### August 14

102.    On August 14, 2013, at approximately 11:49 pm, WRIGHT, using **(443) 992-2067**, sent a text message to telephone number (240) 727-8330 used by UM 8330 stating, "Bra just chopped up 18gs short! Wtf! Bra I need that ASAP?" On August 15, 2013, at approximately 12:30 am, UM8330 sent a text message to WRIGHT, using **(443) 992-2067**, stating, "I weigh ehat come through." At approximately 12:32 am, WRIGHT, using **(443) 992-2067**, responded to UM8330 via text message stating, "Bra I broke them down and weighed them! 18gs short Real Talk!"

103.    Based on training, experience and other interceptions, law enforcement officers believe that **WRIGHT** was discussing the distribution of narcotics. Specifically, law enforcement officers believe that **WRIGHT** inquired about an amount of narcotics, believed to be marijuana, UM8330's weighing marijuana, and payment for a quantity of marijuana which **WRIGHT** did not receive. When **WRIGHT** used the term, "18gs" he was referencing amounts of marijuana.

### August 23

104.    On August 23, 2013, at approximately 4:03 pm, WRIGHT, using **(443) 992-2067**, sent a text message to UF 2568 using telephone number (443) 682-0634.[8] The text message stated, "Can u ck with ur peps on that for me baby need 1." At approximately 4:15 pm, UF 0634 sent **WRIGHT** a text message stating, "The whole 1." At approximately 4:24 pm, **WRIGHT**

---

[8]    US 2568 usually uses telephone number (443) 559-2568, but around the time of this test message, told **WRIGHT** that she would be using (443) 682-0634 briefly and then resuming use of (443) 559-2568.

responded, "Yes but has to be fire." At approximately 5:45 pm, UF0634 replied, "He said he did babe." At approximately 5:50, **WRIGHT** replied, "Ok when." At approximately 5:52 pm, UF0634 responded, "He gets off @ 6. So I told him 2 call u ASAP."

105.   Based on training, experience and the above interception, I believe **WRIGHT** was instructing UF 0634 to assist him in the purchase of narcotics, believed to be marijuana. I believe that the slang term "fire" is used by **WRIGHT** to describe high quality marijuana. Additionally, when **WRIGHT** mentions that he needed "1," I believe **WRIGHT** was referring to $1,000 worth of "fire."

August 25

106.   On August 25, 2013, at approximately 8:05 pm, WRIGHT, using **(443) 992-2067**, sent a text message to telephone number (410) 878-5115, stating, "What's the word homs! Looking for gas! Who got some."

107.   Based on training, experience and the above interception, I believe **WRIGHT** was discussing the purchase of narcotics, believed to be marijuana. I further believed that the slang term "gas" was used to describe high quality marijuana.

**F.   Calls Related to Firearms**

108.   On August 12, 2013, WRIGHT, using **(443) 992-2067**, and an unknown male using telephone number (443) 469-7465 ("UM 7465") engaged in a text message conversation, as follows:

| | |
|---|---|
| **WRIGHT** (12:18 pm): | What's the word bra man! How u making out! |
| UM 7465 (12:29 pm): | I'm bout done. |
| **WRIGHT** (12:35 pm): | Damn son! What u need. |
| UM 7465 (12:37 pm): | U got same stuff. |

Page 40 of 52

| | |
|---|---|
| **WRIGHT** (12:38 pm): | Yes sir. |
| (12:39 pm): | Why not its what u always say u want! Diesel! |
| (12:53 pm): | But it's all diesel! It's outdoor! It will always have sticks! Niggas need to stop crying! |
| UM 7465 (12:54 pm): | That out door aint worth no 2400. |
| (12:55 pm): | Too many sticks. |
| **WRIGHT** (12:58 pm): | Well that's what I paid and that what I'm selling it for so u firgure out what u want to do! I'm not going to keep going back and forth about the stuff u don't want it no problem! I'll get my money and keep it moving n." |
| UM 7465 (12:59 pm): | Ok. |

109.    Based on training, experience and other interceptions, law enforcement officers believe that that **WRIGHT** and the unknown male were discussing the unknown male's purchase of narcotics, believed to be marijuana. Law enforcement officers further believe that when the conversation included terms such as, "diesel," **WRIGHT** and the unknown male were referring to slang terms used to describe marijuana. Law enforcement officers further believe that when **WRIGHT** and unknown male used terms such as" 2400," they were referring to the dollar amount of $2,400.

110.    On August 12, 2013 at approximately 8:38 pm, **WRIGHT**, using **(443) 992-2067**, sent a text message to UM 7465, stating: "I got what I got now a d need to get rid of that! Too much money invested!" At approximately 8:57 pm, UM 7465 sent a text message to **WRIGHT** stating, "U coming." At approximately 8:59 pm, **WRIGHT** responded via text message, "Yeah just got out I footblall! 30mins ill be there!" At approximately 9:30 pm, **WRIGHT** sent a text

message to UM 7465 stating, "U home." At approximately 9:32 pm, the unknown male responded," Yea." At approximately 9:38 pm, **WRIGHT** responded via text message, "Omw."

111.     Based on training, experience and other interceptions, law enforcement officers believe that that **WRIGHT** and the unknown male were discussing meeting at the unknown male's residence to facilitate UM 7465's purchase of narcotics, believed to be marijuana, at UM 7465's residence.

112.     At approximately 9:50 pm on August 12, WRIGHT, using **(443) 992-2067**, called UM 7465 at (443) 469-7469. The following is a transcript of the conversation:

UM 7465:     I'm about to come open the door.

**WRIGHT:**     Hold up. Trying to see who the fuck is this...

UM 7465:     Huh

**WRIGHT:**     ...trying to see who the fuck is this creeping up. Got somebody coming to your house?

UM 7465:     Naw. Who (unintelligible) they in a truck?

**WRIGHT:**     Yea

UM 7465:     What kind?

**WRIGHT:**     Like a Chrysler 300, I mean a Chrysler truck.

UM 7465:     Oh naw. I don't know who that is.

**WRIGHT:**     Fuck is this out here yo?

**WRIGHT:**     Oh he's coming up too.

UM 7465:     Where they at?

**WRIGHT:**     Right here. Right down there right, right, right by your door.

UM 7465:     Some black dudes?

**WRIGHT:**     The truck right here yo. Sitting out here. Got one head light out. Sitting right here.

UM 7465:     Oh yea I see em. I don't know who (unintelligible)

WRIGHT:     (unintelligible)

UM 7465:     I don't know who the fuck that is.

WRIGHT:     Hold up yo. Boy, every time I come (Background noise: clicking sound in the background) come over this motherfucker I got to load my shit up what the fuck? Fuck is going on?

UM 7465:     Huh

WRIGHT:     I said what the fuck is going on.

UM 7465:     I dunno who the fuck that is.

WRIGHT:     [unintelligible]

113.     Based on training and experience, law enforcement officers believe that when **WRIGHT** referred stated, "load my shit" in connection with the "clicking sound" during the above conversation, it is believed that **WRIGHT** manipulated the slide of a gun to chamber a round.

114.     Maryland State Police, Maryland Automated Firearms Services System database records check indicate that on August 12, 2010 a gun, model XD9 was registered to **WRIGHT** at 1227 Waterview Way, Essex, Maryland, 21221.

## VI.     CONCLUSION

115.     Based on the facts set forth in this Affidavit, I submit that there is probable cause to believe that within the Subject Locations, as well as any of the electronic devices, computers, electronic media and electronic storage devices seized from the Subject Locations there is now evidence, fruits, proceeds, and/or instrumentalities, set forth more particularly in Attachment B-1, relating to violations of Title 18 U.S.C. § 201 (bribery of public officials); § 1341 (mail fraud); and § 1343 (wire fraud).

116.    In addition, I submit that there is probable cause to believe that within the Subject Locations, as well as any of the electronic devices, computers, electronic media and electronic storage devices seized from the Subject Locations associated with WRIGHT, namely 1227 Waterview Way and the Waverly Post Office, there is now evidence, fruits, proceeds, and/or instrumentalities, set forth more particularly in Attachment B-2, relating to violations of 18 U.S.C. § 201 (bribery of public officials); § 1341 (mail fraud); and § 1343 (wire fraud), 924(c) (possession of a firearm in furtherance of a drug trafficking crime); and 21 U.S.C. § 841 (distribution of controlled substances) and § 846 (conspiracy to distribute controlled substances).

117.    Electronic devices shall be searched pursuant to the protocol established on Attachment C.

118.   It is requested that Special Agents and/or Task Force Officers of the Federal Bureau of Investigation be authorized to seize, pursuant to 18 U.S.C. § 981(b) and 21 U.S.C. § 853(f), the fund contained in the bank accounts set forth above.  For the reasons stated herein, there is probable cause to believe that such monies are subject to seizure and forfeiture to the United States pursuant to 18 U.S.C. §§ 981 and 982, on the grounds that they constitute the proceeds of the Subject Offenses.

I declare under penalty of perjury that the forgoing is true and correct to the best of my knowledge.

Special Agent ~~Stacy A. Lockitt~~ Mia Winkly
~~United States Postal Service, Office of~~
~~Inspector General~~ Mw
Federal Bureau of Investigation

Subscribed and sworn to before me.

DATE

TIME

The Honorable Susan K. Gauvey
United States Magistrate Judge

Attachment A-1
1227 Waterview Way, Essex, MD 21221

A two-story single family house with light colored siding and nine large front windows with dark trim.

The house number, 1227, is clearly visible with light or gold colored numbers on a dark panel, is affixed directly above the front door. The front door is dark in color with what appear to be two slim window panels on either side. There is a dark trimmed glass storm door in front of the front door that leads into the structure.

There is an unattached garage with light colored siding and a dark colored side door contained within the property of 1227 Waterview Way Essex, MD 21221. The house number, 1227 situated vertically, is affixed to the right of the garage door, with dark numbers on a light colored panel.





Attachment A-2
3000 Homewood Ave. Baltimore, MD 21218

A one story structure with a red brick exterior.

The words United States Postal Service, Waverly Station, Baltimore, MD 21218 are prominently displayed in light colored lettering affixed to the brick exterior of the building.

Wright's office is located in the front of the building, adjacent to the post office window services section. The word "manager" is clearly visible with white lettering on a gray panel affixed to a blue door with blue trim in the window services pubic lobby. This door has one peep hole and a silver colored door knob. The second door is located in the employee section of the post office. This door is located in the front of the post office and can be accessed by walking through the counter line area. It is a white door surrounded by tan trim. There are three Baltimore Ravens stickers affixed to the door; two oval stickers bearing the words "relentless M&T Bank" and one rectangular sticker bearing the words "Ravens M&T Bank." There is paperwork affixed to the door with push pins and magnets. This door has a silver colored door knob and a white air vent located in the lower portion of the door.



Attachment A-3
3703 Old Court Road, Pikesville, MD

A one story structure with a red brick exterior. The words United States Post Office, Pikesville, Maryland are prominently displayed in light colored lettering affixed to the brick exterior of the building.

Parnell's office is located inside the post office building. The office can be accessed from a door on the side of the post office that leads to the outside of the post office. The word "manager" is clearly visible on the door. The door is brown in color.



Attachment A-4
9803 Southall Road, Randallstown, MD 21133

A two-story single family house with a red brick exterior on the front, first floor of the residence and light colored siding on the second story front and sides of the residence. The house has five large front windows with red trim.

The house number, 9803, is clearly visible with white colored numbers affixed to the bricke exterior to the right of the front door. The front door is red in color with a decorative glass panel in the middle. There is a white trimmed glass storm door in front of the front door that leads into the structure.



## ATTACHMENT B-1

### ITEMS TO BE SEIZED

The Subject Location shall be searched for the following:

1.     Business records, including invoices, financial statements, payroll records, receipts, bank records, accounting statements, ledgers, and organizational documents.

2.     Electronic storage media, such as computers, personal digital assistants, cell phones, flash drives, and tablets.

3.     Photographs.

4.     Phone books, address books, calendars

5.     Financial records, including bank deposit slips, bank account statements, check ledgers and bank cards;books, records, bank statements, canceled checks, deposit tickets, financial statements, correspondence and other pertinent documents furnished by or on behalf of the listed individuals indicating the individuals might have a financial interest.

6.     Documents related to use of professional or private money transmitters.

7.     Documents that refer or relate in any way to financial institutions, investment or bank accounts, and credit/debit card accounts.

8.     Documents that refer or relate in any way to assets such as but not limited to vehicles, real estate, precious metals, etc.

9.     Currency or currency equivalents.

## ATTACHMENT B-2

### ITEMS TO BE SEIZED

The Subject Location shall be searched for the following:

1. Business records, including invoices, financial statements, payroll records, receipts, bank records, accounting statements, ledgers, and organizational documents.

2. Electronic storage media, such as computers, personal digital assistants, cell phones, flash drives, and tablets.

3. Photographs.

4. Phone books, address books, calendars

5. Financial records, including bank deposit slips, bank account statements, check ledgers and bank cards; books, records, bank statements, canceled checks, deposit tickets, financial statements, correspondence and other pertinent documents furnished by or on behalf of the listed individuals indicating the individuals might have a financial interest.

6. Documents related to use of professional or private money transmitters.

7. Documents that refer or relate in any way to financial institutions, investment or bank accounts, and credit/debit card accounts.

8. Documents that refer or relate in any way to assets such as but not limited to vehicles, real estate, precious metals, etc.

9. Currency or currency equivalents.

10. Records of shipments of controlled substances.

11. Paraphernalia for packaging and distribution of controlled substances, including scales, plastic bags, vials, cutting agent (such as Mannitol and Quinine), and kilogram wrappers.

12. Firearms and ammunition.

13. Narcotics and controlled substances.

# ATTACHMENT C
## SEARCH PROTOCOL FOR ELECTRONIC DEVICES

1.     In searching for data capable of being read, stored or interpreted by a computer, law enforcement personnel executing this search warrant will employ the following procedure:

2.     The computer equipment and storage devices will be reviewed by appropriately trained personnel in order to extract and seize any data that falls within the list of items to be seized as set forth in Attachment B.

3.     In searching the data, the computer personnel may examine all of the data contained in the computer equipment and storage devices to view their precise contents and determine whether the data falls within the items to be seized as set forth in Attachment B.  In addition, the computer personnel may search for and attempt to recover "deleted", "hidden" or encrypted data to determine whether the data falls within the list of items to be seized as set forth in this attachment.

4.     The agents executing this warrant will file a return with the Court within 10 days of the search.  The return will describe the computer(s) and other digital storage media seized, and give an estimate of the time needed by trained forensic agents to complete a preliminary search of those items.  If that preliminary search indicates that an item does not contain data within the scope of the warrant, the government will promptly make that item available for pickup by the owner.